IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

| | |
|---|---|
| **Coastal Laboratories, Inc.**<br>2 Compromise Street<br>Annapolis, MD 21401<br><br>ANNE ARUNDEL COUNTY<br><br>**AMSOnSite, Inc.**<br>2 Compromise Street<br>Annapolis, MD 21401<br><br>ANNE ARUNDEL COUNTY<br><br>　　　*Plaintiffs*,<br><br>v.<br><br>**Tarun Jolly, M.D.**<br>3 Audubon Place<br>New Orleans, LA 70118<br><br>**James F. Silliman, M.D.**<br>10 Permit Court<br>Georgetown, South Carolina 29440<br><br>**James "Bo" Bauder Silliman**<br>1052 Bexley Street<br>N. Charleston, South Carolina 29405<br><br>**David J. Vigerust, M.S., Ph.D.**<br>5125 Overton Road<br>Nashville, Tennessee 37220<br><br>**Benjamin Williamson**<br>8567 Maggiore Court<br>Naples, Florida 34114-2547<br><br>**Cormeum Lab Services, LLC**<br>4520 Wichers Drive, Suite 105<br>Marrero, LA 70072<br>[registered agent: Cogency Global, Inc., 9800<br>Airline Highway, Suite 105, Baton Rouge, LA | Civil No. _____<br><br>**JURY DEMAND** |

| | |
|---|---|
| 70816]<br><br>**Sensiva Health, LLC**<br>935 Gravier Street, Suite 2020<br>New Orleans, LA 70112<br>[registered agent: Cogency Global, Inc., 9800 Airline Highway, Suite 105, Baton Rouge, LA 70816]<br><br>**Z DiagnostiX, LLC**<br>10 Permit Court<br>Georgetown, South Carolina 29440<br><br>**Vita Health Systems, LLC**<br>3 Audubon Place<br>New Orleans, LA 70118<br>[registered agent Tarun Jolly, 3 Audubon Place, New Orleans, LA 70118]<br><br>  *Defendants*. | |

## COMPLAINT

Plaintiffs Coastal Laboratories, Inc., and AMSOnSite, Inc., by their attorneys Silverman|Thompson|Slutkin|White, LLC, file this Complaint against the defendants in the caption above ("Defendants"). In support, Plaintiffs state as follows:

## INTRODUCTION

1. This is an action for tortious interference with contractual relations, tortious interference with prospective business advantage, conspiracy and injunctive relief.

## JURISDICTION AND VENUE

2. This Court has jurisdiction pursuant to 28 U.S.C. § 1332(a).

3. Venue is proper under 28 U.S.C. § 1391(b)(3), and this Court has personal jurisdiction over Defendants pursuant to Md. Code Ann., Cts. & Jud. Proc § 6-103(b)(4), because defendants or their agents conspired to cause tortious injury in Maryland by an act or acts

committed in that State. Alternatively, venue is proper under 28 U.S.C. § 1391(b)(2) because a substantial part of the events giving rise to this complaint occurred in this judicial district.

## THE PARTIES

4. Plaintiff Coastal Laboratories, Inc. ("Coastal"), is a Delaware corporation with its principal place of business at 2 Compromise Street, Annapolis, Maryland 21401. Coastal uses proprietary molecular technology platform that allows it to generate timely and accurate analyses of dozens of respiratory pathogens including COVID-19.

5. Plaintiff AMSOnSite, Inc. ("AMS"), is a Delaware corporation with its principal place of business at 2 Compromise Street, Annapolis, Maryland 21401. AMS provides clinical environmental infection prevention and control services to residential nursing and rehabilitation facilities in several states, including Maryland ("Nursing Homes").

6. Defendant Tarun Jolly, M.D. is an individual and principal of co-Defendant Cormeum Lab Services, LLC who resides and regularly conducts business in New Orleans, Louisiana. Dr. Jolly recently settled a *qui tam* action with the United States Department of Justice in which he and other defendants agreed to pay a $1 million fine in connection with a Medicare fraud investigation. Jolly's scheme involved kickbacks in exchange for referrals for medical testing conducted by a laboratory co-owned by Jolly. Also in connection with the fraud investigation, Jolly's laboratory agreed to forego collection of over $41 million of billing to Medicare that was associated with the kickback scheme and received a 25-year ban excluding the lab from doing business with the Centers for Medicare & Medicaid Services. Upon information and belief, Jolly's lab recently ceased operations entirely.

7. Defendant James Silliman, M.D., is an individual and principal of co-defendants Sensiva Health, LLC and Z Diagnostix, LLC, and resides and regularly conducts business in

South Carolina. Upon information and belief, Silliman was removed as chief executive officer of a company called Volente Health LLC when it became involved in a large federal Medicare fraud investigation in 2018. Volente operated in association with Provista Labs, LLC, which co-Defendant Jolly subsequently sold to Coastal as described below.

8. Defendant James "Bo" Bauder Silliman is an individual who resides and regularly conducts business in South Carolina. Bo Silliman, the son of co-Defendant James Silliman, holds himself out as an officer of co-Defendant Z DiagnostiX, LLC and an expert in Medicare, Medicaid and other healthcare payment mechanisms.

9. Defendant David F. Vigerust is an individual who resides and regularly conducts business in Tennessee. Vigerust is chief scientific and compliance officer for co-Defendant Sensiva Health, LLC, and also holds himself out as an officer of co-Defendant Z DiagnostiX, LLC.

10. Defendant Benjamin Williamson is an individual who holds himself out as a co-founder and principal of co-defendants Sensiva Health, LLC and Vita Health Systems, LLC, and resides and regularly conducts business in Florida. Williamson touts himself as an expert in laboratory and healthcare services practice management software applications and systems.

11. Defendant Cormeum Lab Services, LLC ("Cormeum"), is a Louisiana limited liability company formed on June 14, 2019, with a place of business at 4520 Wichers Drive, Suite 105, Marrero, Louisiana 70072. Upon information and belief, and according to its website and other materials, Cormeum holds itself out as a high volume, certified Clinical Laboratory Improvement Amendments ("CLIA") medical laboratory affiliated with co-Defendant Sensiva Health, LLC, and which provides laboratory testing services similar to Coastal.

12. Defendant Sensiva Health, LLC ("Sensiva") is a Louisiana limited liability company formed on March 23, 2020, with a place of business at 935 Gravier Street, Suite 2020, New Orleans, Louisiana 70112. Upon information and belief, and according to its website and other materials, Sensiva holds itself out as a provider of COVID-19 virus and antibody testing and consulting services with rapid, accurate results that set it apart from competitors. Sensiva utilizes co-Defendant Cormeum to provide laboratory services for its testing needs.

13. Defendant Z DiagnostiX, LLC ("ZDX") is, upon information and belief, a limited liability company formed in Delaware on November 5, 2019, and is owned and/or managed by co-defendants James Silliman and David Vigerust. ZDX's place of business at 10 Permit Court, Georgetown, South Carolina is co-Defendant Silliman's residence. ZDX holds itself out as a management company that assists diagnostic laboratories with their management and marketing efforts.

14. Defendant Vita Health Systems, LLC ("Vita"), is a Louisiana limited liability company formed on July 2, 2019, with a place of business at 3 Audubon Place, New Orleans, Louisiana 70118, which also is co-Defendant Jolly's residence. According to the Louisiana Secretary of State, Vita is not in good standing for failure to file an annual report. On its website, Vita states that "Sensiva Health is a company within our direct to consumer wing that provides at home lab testing kits with a twist; *we own the labs running the tests*." (Emphasis supplied.) Williamson's company Vita holds itself out as a healthcare technology provider of practice management applications such as Laboratory Information Management Systems ("LIMS") that are used by diagnostic laboratories to process and report test results, and to upload billing information to billing entities to invoice for testing services rendered.

15. Upon information and belief, co-defendants Cormeum, Sensiva, ZDX and Vita Health are affiliated and share common ownership and/or management by co-defendants Jolly, James Silliman, Bo Silliman, Vigerust and Williamson, all of whom conspired and participated together in the matters set forth in this complaint.

## FACTUAL BACKGROUND

16. AMS administers a complete infection control management program called Sterisis that was designed specifically for Nursing Homes. The Sterisis program assists Nursing Homes to create processes, protocols, training and other measures to prevent and control infection, including quarterly and systemic non-invasive respiratory testing.

17. Beginning in 2017, the principals of AMS sought to partner with a laboratory that would allow AMS to test and analyze the samples it collected through the Sterisis program.

18. In Fall 2017, AMS's president Patrick Britton-Harr ("Britton-Harr"), was in discussions to partner with a lab in Tennessee. As a result of relationships developed during those discussions, Britton-Harr was introduced to Defendant James Silliman and his company Volente Health LLC ("Volente"). The negotiations to partner with the Tennessee lab ultimately fell through, leading AMS' principals to search for other opportunities.

19. In December 2019, AMS' principals were still looking to partner with a testing lab. On or about December 19 and 20, 2019, Britton-Harr received text message and email correspondence from Defendant James Silliman who said he knew of labs that AMS might be interested in acquiring. Britton-Harr expressed interest and James Silliman offered to arrange an introduction to the lab's owner, co-Defendant Jolly. Britton-Harr agreed.

20. Britton-Harr and Defendant Jolly thereafter spoke on the telephone many times through February 2020. Just 4 months earlier, it was announced that Jolly and two partners had

agreed to pay a $1 million fine to the U.S. Department of Justice in connection with the settlement of a *qui tam* action concerning a Medicare kickback scheme.

21.     During their conversations, Jolly told Britton-Harr he was looking to get out of the laboratory business and that he had two labs for sale in Arizona, one in Phoenix and the other in Scottsdale.  The Scottsdale lab was owned by a Delaware limited liability company, Provista Health, LLC ("Provista"), and the Phoenix lab was owned by a Louisiana limited liability company, Integra Molecular, LLC ("Integra").  Jolly was the sole member and 100% owner of both Provista and Integra (collectively, the "Arizona Labs").

22.     The previous owner of Jolly's Provista lab was Volente, a company for which co-Defendant Silliman had served as chief executive officer. Upon information and belief, Silliman was removed from that position when the company became involved in a national federal criminal investigation for Medicare fraud in 2018-2019.

23.     Britton-Harr formed Coastal to purchase the Arizona Labs, which, among other things, would provide laboratory services in support of AMS' Sterisis infection control and prevention program.

24.     While Britton-Harr and Jolly negotiated the purchase and sale of the Arizona Labs, the deadly COVID-19 pandemic broke out and caused the immediate need for laboratories to test individuals for infection by the virus.

25.     AMS had a substantial number of then-existing and valuable contractual relationships with Nursing Homes for which AMS provided the infection control and prevention services described above. Nursing Homes were, and remain, among the most in need of immediate COVID-19 testing because their residents are the highest risk population for serious illness or death if they contract the virus.

26. On February 29, 2020, the first United States death from COVID-19 was reported at a nursing home facility in Kirkland, Washington. The announcement was accompanied by the declaration of a state of emergency by Washington Governor Jay Inslee. These (and related) events received widespread national publicity and quickly thereafter essentially shut down the United States.

27. Coastal and AMS immediately recognized that the COVID-19 pandemic could ravage Nursing Homes and thus began efforts to expand services to meet anticipated nationwide need to control the spread of the infection.

28. During the February 2020 telephone discussions between Britton-Harr and Defendant Jolly about acquisition of the Arizona Labs, Britton-Harr repeatedly informed Defendant Jolly that Coastal expected a surge in testing volume and therefore Coastal needed to equip the labs to meet the volume expected and obtain whatever regulatory authorization that would be required to permit COVID-19 testing.

29. Those discussions expanded to include co-defendants James Silliman, Bo Silliman, Vigerust and Williamson, each of whom along with co-Defendant Jolly repeatedly assured Coastal that the Arizona Labs were properly equipped to handle current non-COVID-19 testing volume. However, in response to plaintiffs' plans to perform high volume COVID-19 testing, and in anticipation of the expected imminent surge in COVID-19 testing volume, the co-defendants also advised Coastal on steps it needed to take to be able to perform such testing, including adding laboratory equipment, gaining regulatory approval, and improving practice management, reporting and billing systems and software.

30. The discussions included an in-person meeting in Charleston, South Carolina, on March 6, 2020, at which Coastal principals Britton-Harr and G. Ellsworth Harris V reiterated to

ZDX that a material incentive for Coastal to acquire the Arizona Labs, and a key reason for Coastal to engage ZDX, was for ZDX to assist Coastal to complete regulatory compliance procedures so the labs could perform COVID-19 testing. The ZDX representatives in attendance—defendants James Silliman, Bo Silliman, and David Vigerust—assured Coastal that ZDX could and would meet Coastal's needs and timeline.

31. With regard to those regulatory requirements, the U.S. Food & Drug Administration ("FDA") ultimately required that any lab that wanted to perform COVID-19 testing must obtain an Emergency Use Authorization ("EUA") prior to testing and as a prerequisite to billing for laboratory services.

32. Upon announcement of that requirement, ZDX assured Coastal it could obtain a COVID-19 EUA and, in fact, provided Coastal's representatives with a detailed timeline specifying the procedures ZDX would take to obtain EUAs for the Arizona Labs.

33. ZDX, through the individual co-defendants, repeatedly assured Coastal and AMS at the February meeting and on telephone calls that the Arizona Labs would be validated, certified, credentialed, fully operational and up and running within 30 days from the date ZDX personnel arrived at the Arizona Labs to begin the EUA approval process.

34. Upon information and belief, at the same time as the Arizona Labs negotiations were ongoing, Jolly, Silliman, Vigerust and Williamson also recognized the acute need for COVID-19 testing and formed Sensiva (which was incorporated in March, 2020) for the purpose of administering COVID-19 tests. Sensiva performed for Cormeum the same role that AMS performed for Coastal except that Sensiva did not offer a program similar to AMS' proprietary Sterisis infection prevention and control program.

35. On March 15, 2020, Coastal and ZDX entered into a "Management Services

Agreement" whereby ZDX agreed to provide laboratory management services and quickly obtain EUAs to enable Coastal to perform COVID-19 testing.

36. ZDX never performed any of those services for Coastal, which still does not have the necessary EUAs, despite being paid $90,000 per month before Coastal terminated ZDX for nonperformance on May 17, 2020.

37. On March 18, 2020, with the ZDX Management Services Agreement executed and a plan in place to obtain the COVID-19 EUAs that would enable Coastal to fulfill its business plan, Coastal as buyer and Jolly as seller executed a "Membership Interest Purchase Agreement" ("Purchase Agreement") in which Jolly sold to Coastal 100% of his interests in Provista and Integra for $3 million.

38. Satisfied that it had a plan in place to address COVID-19 testing, Plaintiffs immediately began contacting their Nursing Home customers to offer this service. In the following weeks, Plaintiffs entered into contracts with dozens of Nursing Homes to perform this testing, including approximately 30 such Homes in Maryland.

39. Immediately after entering into the Management Services Agreement with Coastal, ZDX sent personnel to the Arizona Labs for the purposes of, among other things, managing the Arizona Labs, scaling up the Arizona Labs' testing volume capability, and promptly obtaining EUA certifications.

40. Unbeknownst to Coastal, ZDX redirected certain of its personnel from the Arizona Labs and sent them to New Orleans to obtain an EUA for co-Defendant Cormeum while charging Coastal for hotel rooms in New Orleans and using employees that Coastal was paying to do work for the Arizona Labs to obtain the EUA for Defendant Cormeum.

41. ZDX filed EUA paperwork for Cormeum on April 4, 2020.

42. The FDA received Cormeum's EUA application on April 6, 2020. Pursuant to FDA regulations, labs are permitted to begin COVID-19 testing 24 hours after FDA receives the application.

43. Because ZDX had failed to take any steps to obtain the EUA for the Arizona Labs, and facing an increased volume of COVID-19 samples that required testing, Coastal faced the crisis of not being able to perform COVID-19 testing.

44. *The very next day (i.e., 24 hours after Cormeum received its EUA)*, Defendant James Silliman told Coastal he had a solution for Coastal's lack of an EUA for the Arizona Labs. That solution was to send all COVID-19 test samples to co-Defendant Jolly's lab, co-Defendant Cormeum.

45. Faced with the COVID-19 testing crisis, Coastal accepted Defendant James Silliman's advice to engage Defendant Cormeum to perform COVID-19 testing, supposedly on a temporary basis, until Coastal obtained EUAs for the Arizona Labs.

46. *Once again, on that same day, April 7,* within hours of suggesting Coastal engage co-Defendant and Silliman affiliate Cormeum, James Silliman coordinated delivery of a "Laboratory Services Work Order" between Coastal and Cormeum. The work order stated the terms under which Cormeum would provide laboratory services to Coastal with respect to COVID-19 testing, including a cost to Coastal of $87 per test.

47. AMS began sending COVID-19 test samples directly to Cormeum for processing, rather than to Coastal's Arizona Labs. Because many samples needed to be tested not only for COVID-19 but also for other respiratory pathogens, once Cormeum finished the COVID-19 testing, the remainder of each sample was forwarded to Coastal to complete the testing for which a COVID-19 EUA was not required.

48.     Defendants created this cumbersome, inefficient process for the purpose of cutting Coastal out of the COVID-19 testing business that the defendants purportedly were assisting Coastal to operate at the Arizona Labs.

49.     In May 2020, Defendant Jolly contacted Britton-Harr and claimed that a government contract that Cormeum recently entered into required it to charge the government customer the lowest fee for COVID-19 testing that Cormeum charged its other customers, and claimed that the government contract paid Cormeum $120 per test.

50.     Jolly claimed that the $87 per test fee Cormeum charged Coastal therefore had to be increased so that Cormeum would not be in violation of the "most favored nation" pricing treatment required by the government contract. Jolly generously agreed to charge Coastal "only" $110 per test, which of course was more than a 26% price increase.

51.     Coastal, which was receiving a volume of COVID-19 samples for testing and still had no EUAs for the Arizona Labs being managed by Defendant ZDX, had no choice but to agree to the price increase so that testing would not be interrupted and thereby potentially put Nursing Home residents' lives at risk.

52.     In addition to Cormeum's sudden price hike, and citing his own need for faster payment, Jolly also required that Coastal pay for Cormeum's COVID-19 testing services weekly despite that industry standard payments terms are in the range of net 15 to net 30 days after invoice date. The industry standard reflects the time it typically takes for laboratories to invoice and receive payment from primary payor sources such as Medicare.  At that time, nothing in the companies' short history of working together would have justified such a request, as Coastal had been timely to date in paying all invoices.

53.     On June 17, 2020 in the late afternoon, Defendant Jolly again contacted Britton-

Harr by telephone to request yet another change in the Cormeum-Coastal laboratory services relationship.

54. Just a few hours later, shortly after midnight on June 18, Defendant Jolly emailed Britton-Harr a draft letter agreement called "Limited Adjustment Period for Payment of Invoices for Goods & Services; Revised Pricing Terms for Guaranteed Minimums & Limited Exclusivity."

55. The June 18 letter agreement included a substantially reduced price for COVID-19 testing so long as Coastal met a minimum volume of testing samples, of which at least 75% of Coastal's samples were for both COVID-19 *and* non-COVID-19 testing.

56. The reduced COVID-19 price was $70, far lower than supposedly required pursuant to the government contract and also lower than Cormeum's original price of $87 per COVID-19 test.

57. Cormeum also informed Coastal that it needed additional laboratory equipment owned by Coastal and used in its Arizona Labs so that Cormeum could meet the testing volume coming from Plaintiffs. Cormeum required that Coastal overnight ship its equipment, valued at approximately $500,000, to Cormeum at its laboratory in Louisiana. Coastal complied. Cormeum remains in possession of Coastal's equipment as of this filing.

58. Coastal and Cormeum operated under the terms of the June 18 letter agreement until the week of July 13 when, despite that Coastal was in full compliance with its obligations, Cormeum began making aggressive demands for payment of invoices *prior* to the agreed due dates.

59. On July 10, 2020, Jolly sent an email message to Britton-Harr claiming that Coastal was far behind on its payments for testing and that critical vendors were not shipping

supplies until they are paid, and that therefore COVID-19 testing is either "at a stop" or "significantly delayed." This is a lie – Coastal was then current on its payment obligations.

60. Coastal had in fact paid to Cormeum a total of $1,723,856 which satisfied all invoices Cormeum issued through June 28, 2020. Therefore, as of July 10, Coastal was current on all its obligations to Cormeum and there was no basis for Jolly's threats and demands.

61. Three days later, on July 13, 2020 Jolly again emailed Britton-Harr threatening to stop testing unless payments were made immediately. At that time, no invoices were overdue, and the parties' agreement provided that no payment was due until at least July 17.

62. On July 14, 2020, without any legitimate basis to do so and without warning to Coastal or AMS, Cormeum and Sensiva, at the direction of co-defendants Jolly and Silliman, suddenly halted shipments of test kits to Nursing Homes.

63. On July 16, while Coastal was still in compliance with the parties' invoice payment terms, Jolly's attorney, Asher J. Friend of the Jones Walker LLP firm, emailed to Coastal representatives a proposed "settlement" agreement under which Coastal's purportedly "past-due" invoices to Cormeum would be deemed satisfied if Coastal: forfeited to Cormeum the equipment and supplies Coastal had loaned to Cormeum to facilitate COVID-19 testing; assigned to Cormeum all of its claims for Medicare reimbursement for COVID-19 testing and appointed co-Defendant James Silliman as Coastal's "true and lawful attorney-in-fact" with regard to those claims; and most tellingly, "formally introduce[d] and refer[ed] to Cormeum its current and prospective third party customers" and "use[d] its best efforts to assist Cormeum and its Affiliates in consummating the direct commercial engagement of Cormeum and its Affiliates by the Coastal Customers for, potentially among other things, COVID-19 Testing and related products and services."

64. Defendants' scheme at this point was quite clear. In essence, Cormeum now insisted that Coastal surrender its entire business at a time when Coastal had not committed any default of any then-existing agreement with Cormeum.

65. Coastal refused to sign the settlement agreement.

66. On July 17, following Coastal's refusal to accept the proposed "settlement," Defendants suddenly and without any warning blocked Plaintiffs from access to the web portal where test results were to be reported.

67. The next day, July 18, again without any warning, Defendants suddenly cut off all of AMS' Nursing Homes customers' access to the web portal. This act was especially egregious because Defendants knew that Nursing Homes were required to provide daily test results to state health departments, including the Maryland Department of Health. By cutting off Nursing Homes' ability to comply with state authorities' reporting requirements, Defendants created an unreasonable risk to public health and intentionally put thousands of lives at risk by preventing the Nursing Homes and the states from monitoring and adjusting to the deadly COVID-19 threat.

68. COVID-19 testing for Nursing Homes, including AMS' customers, was needed not merely to meet clinical needs *but also to satisfy strict COVID-19 test result reporting requirements imposed by state, local and regulatory authorities* as part of a worldwide effort to stem the rapid spread of the deadly COVID-19 virus.

69. Immediately after Defendants cut-off Nursing Homes' access to COVID-19 test results, Coastal and AMS received an intense storm of complaints from their Nursing Home customers.

70. The Nursing Homes feared that lack of access to COVID-19 test results forced them to "fly blind" in the virulently contagious COVID-19 environment by making infection

identification, prevention and control completely impossible.

71. In addition, Defendants' actions exposed the Nursing Homes to regulatory and enforcement action by state authorities that include severe financial penalties and other enforcement action.

72. But cutting off access to the portal was just the half of it. Defendant Vita Health, which hosted the web portal where COVID-19 test results were to be reported to the Nursing Homes, provided a link to a "help desk" service that falsely claimed Coastal was not paying its bills to the lab (Cormeum) and that Defendant Sensiva was ready and able to restore service if only the Nursing Homes would switch from Coastal and AMS for COVID-19 testing.

73. For example, on July 18 at 3:36 p.m. UTC, an employee of AMS' customer Hyattsville Nursing and Rehabilitation Center, located in Hyattsville, Maryland, tried to access the portal, couldn't, and then clicked on the "help desk" to which an agent with an email address of "support@sensiva.zendesk.com" responded and informed the Nursing Home employee:

> "At this time, we have unfortunately had to turn off access for this facility due to long-standing non-payment. We are happy to continue processing and reporting samples from this facility **as long as we are contracted directly** and can receive demographic information and medical necessity information prior to processing the sample. **The service level will improve with this in place** and all reports will be delivered the day of receipt in the lab. We are happy to ship supplies as needed to the facilities. For further assistance with this matter **your administrators may contact our President of Sensiva Health, Dr. Jim Silliman and he can be reached by phone at 864.901.7590, and by email at jsilliman@sensivahealth.com**. Is there anything else I can help you with?"

(Emphasis supplied.)

74. In other words, if that Maryland customer broke its contract with AMS and contracted directly with Sensiva, the test results would be released.

75. Upon information and belief, all of Plaintiffs' Maryland customers received

similar messages from Defendants.

76. AMS sought to expand its relationship and Sterisis program to additional Nursing Homes located in Maryland, including CommuniCare Health Services, which has a location in Elkton, Maryland. CommuniCare Health Services declined to employ AMS in additional facilities, citing the difficulties described above and that were caused by defendants' unlawful scheme to steal plaintiffs' businesses.

## COUNT I -Tortious Interference with Prospective Business Relations
**(Against All Defendants)**

77. Plaintiffs adopt and incorporate by reference into this Count as if fully set forth in this paragraph each of the allegations contained in each of the numbered paragraphs of this complaint.

78. Defendants or their agents intentionally and willfully refused to send testing kits to plaintiffs' nursing home partners and blocked those same nursing homes from accessing their test results.  Then, when the nursing homes (including a nursing home located in Maryland) inquired about the lack of access, defendants or their agents told the homes that they would be "happy" to restore access to essential (and legally mandated) COVID-19 tests and test results if the homes "contracted directly" with co-Defendant Sensiva.

79. Defendants' actions were plainly calculated to cause damage and loss to Plaintiffs in their lawful business as evidenced by the fact that CommuniCare refused to enter into a business relationship with Plaintiffs for COVID-19 testing, when Plaintiffs already had a business relationship with CommuniCare for other testing, because of the perceived concerns identified above that CommuniCare naturally attributed to Plaintiffs but were in fact manufactured by the defendants.

80. Defendants' actions constituted malice as they were done with the unlawful and deliberate purpose of causing such damage and loss to plaintiffs' business, without right or justifiable cause on the part of the defendants.

81. Actual damage and loss resulted.

WHEREFORE, Plaintiffs demand a judgment exceeding $75,000 against each Defendant, jointly and severally, in an amount to be proved at trial, plus pre-and post-judgment interest, costs, and attorneys' fees to the extent recoverable under applicable law, and punitive damages in an amount to be determined by this Court.

### COUNT II – Tortious Interference with Economic Relations
### (Against All Defendants)

82. Plaintiffs adopt and incorporate by reference into this Count as if fully set forth in this paragraph each of the allegations contained in each of the numbered paragraphs of this complaint.

83. Plaintiffs had contracts with third-party nursing homes, including entities in Maryland, under which they were to collect and test samples for COVID-19 and other respiratory pathogens.

84. Defendants knew of those contracts through their many business dealings with Plaintiffs, all of which were intended to assist plaintiffs in fulfilling their contractual obligations to third-party nursing homes.

85. Defendants intentionally interfered with those contracts by holding hostage COVID-19 tests and test results in the hope that the Nursing Homes would break their contracts with Plaintiffs and directly engage the services of Defendants.

86. Defendants' actions rendered it impossible for Plaintiffs' Nursing Home

customers to obtain COVID-19 test results called for in their contracts with Plaintiffs.

87. The Nursing Homes were in fact unable to perform under their contracts with Plaintiffs due solely to Defendants' intentional interference with COVID-19 test result reporting.

88. Defendants' intentional and unlawful actions interfered with the Nursing Homes' business expectations that they would be able to access the COVID-19 test result reporting portal, and in fact the Nursing Homes were unable to access the portal to obtain COVID-19 test results.

89. The Maryland Department of Health contacted Defendants on or about Saturday, July 25, 2020, to demand that Defendants release COVID-19 test results to the Nursing Homes that Defendants held hostage by shutting down access to the results reporting web portal.

WHEREFORE, Plaintiffs demand a judgment exceeding $75,000 against each Defendant, jointly and severally, in an amount to be proved at trial, plus pre-and post-judgment interest, costs, and attorneys' fees to the extent recoverable under applicable law, and punitive damages in an amount to be determined by the Court.

## COUNT III – Civil Conspiracy
### (Against All Defendants)

90. Plaintiffs adopt and incorporate by reference into this Count as if fully set forth in this paragraph each of the allegations contained in each of the numbered paragraphs of this complaint.

91. Defendants agreed to work together and in concert to tortuously interfere with Plaintiffs' business and contractual partners, as evidenced by the coordinated actions of Defendants to impede Coastal's effort to obtain an EUA for COVID-19 testing, divert Plaintiffs' business to Defendants' own lab, Cormeum, divert Plaintiffs' customers to Defendant Sensiva,

and ultimately steal Plaintiffs' entire business by denying their Nursing Home customers access to COVID-19 tests and results.

92. As result of Defendants' coordinated effort to impede, divert, and then steal Plaintiffs' business, Plaintiffs suffered actual legal damage.

WHEREFORE, Plaintiffs demand a judgment exceeding $75,000 against each Defendant, jointly and severally, in an amount to be proved at trial, plus pre-and post-judgment interest, costs, and attorneys' fees to the extent recoverable under applicable law, and punitive damages in an amount to be determined by the Court.

## JURY DEMAND

Plaintiffs demand a trial by jury pursuant to Fed R. Civ. P. 38(b) on all triable issues.

Dated: July 31 2020                                    Respectfully submitted,

                                                       /s/
                                                       Andrew C. White, Esq. (Bar No. 08821)
                                                       awhite@silvermanthompson.com
                                                       Steven N. Leitess, Esq. (Bar No. 05856)
                                                       sleitess@silvermanthompson.com
                                                       William N. Sinclair, Esq. (Bar No. 28833)
                                                       bsinclair@silvermanthompson.com
                                                       SILVERMAN|THOMPSON|SLUTKIN|WHITE, LLC
                                                       201 N. Charles Street, Suite 2600
                                                       Baltimore, Maryland 21201
                                                       Tel: (410) 385-2225
                                                       Fax: (410) 547-2432

                                                       *Attorneys for Plaintiffs*