## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

COASTAL LABORATORIES, INC., *
*et al.*,

  Plaintiffs,   *

              Civil Action No. RDB-20-2227

  v.      *

TARUN JOLLY, M.D., *et al.*, *

         *

  Defendants.

\* \* \* \* \* \* \* \* \* \* \* \* \*

### MEMORANDUM OPINION

Plaintiffs Coastal Laboratories, Inc. and AMSOnSite, Inc. (collectively, "Plaintiffs") bring this tort action against individual Defendants Tarun Jolly, M.D., James F. Silliman, M.D., James Bauder "Bo" Silliman,  David J. Vigerust, M.S., Ph.D., and Benjamin Williamson, and corporate Defendants Cormeum Lab Services, LLC, Sensiva Health, LLC, Z DiagnostiX, LLC, and Vita Health Systems, LLC (collectively, "Defendants") with respect to Plaintiffs' efforts to acquire medical testing laboratories to assist their infection control management program designed specifically for nursing homes.  Plaintiffs allege tortious interference with prospective business relations (Count I), tortious interference with economic relations (Count II), civil conspiracy (Count III), unfair competition (Count V), and fraud (Count VI) against all Defendants.  (Am. Compl., ECF No. 13.)  In addition, Plaintiffs allege a conversion claim against Defendant Cormeum (Count IV).  (*Id.*)  Presently pending is Defendants' Motion to Dismiss Plaintiffs' Amended Complaint Pursuant to Rules 12(b)(3), 12(b)(2), 12(b)(6), and the "First-Filed" Rule.  (ECF No. 14.)  On November 18, 2020, this Court conducted a motions

hearing and heard argument on the pending Motion. *See* Local Rule 105.6 (D. Md. 2018). For the reasons stated on the record at the motions hearing, and for the reasons that follow, Defendants' Motion to Dismiss Plaintiffs' Amended Complaint Pursuant to Rules 12(b)(3), 12(b)(2), 12(b)(6), and the "First-Filed" Rule (ECF No. 14) shall be DENIED.

## BACKGROUND

In ruling on a motion to dismiss, this Court "accept[s] as true all well-pleaded facts in a complaint and construe[s] them in the light most favorable to the plaintiff." *Wikimedia Found. v. Nat'l Sec. Agency*, 857 F.3d 193, 208 (4th Cir. 2017) (citing *SD3, LLC v. Black & Decker (U.S.) Inc.*, 801 F.3d 412, 422 (4th Cir. 2015)). The Court may consider only such sources outside the complaint that are, in effect, deemed to be part of the complaint, for example, documents incorporated into the complaint by reference and matters of which a court may take judicial notice. *Sec'y of State for Defence v. Trimble Navigation Ltd.*, 484 F.3d 700, 705 (4th Cir. 2007).

Plaintiffs Coastal Laboratories, Inc. ("Coastal Labs") and AMSOnsite, Inc. ("AMS") are Delaware corporations with their principal places of business in Annapolis, Maryland. (Am. Compl ¶¶ 7-8, ECF No. 13.) Coastal Labs uses a proprietary molecular technology platform that allows it to generate timely and accurate analyses of dozens of respiratory pathogens, including COVID-19. (*Id.* ¶ 7.) AMS provides clinical environmental infection prevention and control services to residential nursing and rehabilitation facilities in several states, including Maryland. (*Id.* ¶ 8.)

Defendant Cormeum Lab Services, LLC ("Cormeum") is a Louisiana LLC formed on June 14, 2019 with its place of business in Louisiana. (*Id.* ¶ 14.) Cormeum is a medical laboratory affiliated with co-Defendant Sensiva Health, LLC, ("Sensiva") and provides lab

testing services similar to Coastal Labs.  (*Id.*)  Defendant Sensiva is a Louisiana LLC formed on March 23, 2020 with its place of business in Louisiana.  (*Id.* ¶ 15.)  Sensiva is a provider of COVID-19 virus and anti-body testing and consulting services, and claims rapid, accurate results that set it apart from competitors.  Sensiva uses Cormeum Labs to provide lab services for its testing needs.  (*Id.*)  Defendant Z DiagnostiX, LLC ("ZDX") is a Delaware LLC formed on November 5, 2019 with its place of business in South Carolina.  (*Id.* ¶ 16.)  ZDX holds itself out as a management company that assists diagnostic labs with their management and marketing efforts.  (*Id.*)  Defendant Vita Health Systems, LLC ("Vita") is a Louisiana LLC formed on July 2, 2019 with its place of business in Louisiana.  (*Id.* ¶ 17.)  Vita is a healthcare technology provider of practice management applications that are used by diagnostic labs to process and report test results, and to upload billing information to billing entities to invoice for testing services rendered.  (*Id.*)

Plaintiffs allege that the corporate Defendants Cormeum, Sensiva, ZDX, and Vita are affiliated and share common ownership and/or management with the individual Defendants Tarun Jolly, James Silliman, Bo Silliman, David Vigerust, and Benjamin Williamson. (*Id.* ¶ 18.) Defendant Tarun Jolly, M.D. ("Dr. Jolly") is a resident of New Orleans, Louisiana, and is a principal of Defendant Cormeum.  (*Id.* ¶ 9.)  Defendant James Silliman, M.D. ("James Silliman") is a resident of South Carolina and is a principal of Defendants Sensiva and ZDX. (*Id.* ¶ 10.)  Defendant James Bauder Silliman ("Bo Silliman") is a resident of South Carolina and is Dr. Silliman's son.  (*Id.* ¶ 11.)  Bo Silliman holds himself out as an officer of Defendant ZDX.  (*Id.*)  Defendant David Vigerust ("Vigerust") is a resident of Tennessee and is Chief Scientific and Compliance Officer for Defendant Sensiva.  (*Id.* ¶ 12.)  Vigerust also holds

himself out as an officer for Defendant ZDX.  (*Id.*)  Defendant Benjamin Williamson is a resident of Florida and is the co-founder and principal of Defendants Sensiva and Vita.  (*Id.* ¶ 13.)

## I.   The parties' relationship

In 2017, Plaintiff AMS sought to partner with a lab to test and analyze samples AMS collected through its infection control management program designed for nursing homes known as "Sterisis."  (*Id.* ¶¶ 19-20.)  After negotiations to partner with a potential lab in Tennessee fell through, AMS was still looking to partner with a testing lab in December of 2019.  (*Id.* ¶¶ 21-22.)  On or about December 19 and 20, 2019, the president of AMS, Patrick Britton-Harr, received a text message and email from Defendant James Silliman who said he knew of labs that AMS may be interested in acquiring.  (*Id.* ¶ 22.)  Britton-Harr was interested, and James Silliman arranged an introduction with Dr. Jolly, the owner of Cormeum Labs.  (*Id.*) However, it is alleged that, in October of 2019, the U.S. Department of Justice announced, and the media reported, that Dr. Jolly and two of his partners agreed to pay a $1 million fine to the DOJ in connection with a *qui tam* settlement regarding a Medicare kickback scheme. (*Id.* ¶ 23.)

Britton-Harr and Jolly spoke over the phone several times in February of 2020.  (*Id.*) Jolly told Britton-Harr that he had two labs for sale in Arizona, one in Scottsdale owned by Provista Health, LLC and one in Phoenix owned by Integra Molecular, LLC.  (*Id.* ¶ 24.)  Dr. Jolly was the sole member and 100% owner of both Provista and Integra ("the Arizona labs"). (*Id.*)  The Provista lab was previously owned by a company named Volente, whose CEO was Defendant James Silliman.  (*Id.* ¶ 25.) Britton-Harr decided to purchase the Arizona labs to

provide lab services in support of AMS' Sterisis infection control and prevention program. (*Id.* ¶ 26.) Britton-Harr formed Coastal Labs to do so. (*Id.*)

## II.     COVID-19 Pandemic

While Britton-Harr and Jolly were negotiating the purchase and sale of the Arizona labs, the COVID-19 Pandemic broke out and created the immediate need for labs to test individuals for infection by the virus. (*Id.* ¶¶ 27-29.) Nursing homes were among the most in need of immediate COVID-19 testing, prompting Coastal and AMS to expand services to meet anticipated nationwide need to control the spread of the virus. (*Id.* ¶ 30.) AMS had a substantial number of then-existing contractual relationships with nursing homes for which it provided infection control and prevention services. (*Id.* ¶ 28.)

During negotiations, Britton-Harr allegedly repeatedly informed Dr. Jolly and co-Defendants James Silliman, Vigerust, and Williamson that Coastal Labs expected a surge in testing volume and needed to equip the Arizona labs to meet the volume expected and obtain the required regulatory authorization to permit COVID-19 testing. (*Id.* ¶ 31.) The COVID-19 compliance procedures required any lab that wanted to perform COVID-19 testing to obtain an "Emergency Use Authorization" ("EUA") prior to testing and as a prerequisite to billing for lab services. (*Id.* ¶ 34.) Dr. Jolly, James Silliman, Vigerust, and Williamson repeatedly assured Coastal that the Arizona labs were properly equipped to handle current non-COVID-19 testing volume, but advised Coastal on steps that it needed to take to be able to perform the larger COVID-19 testing volume, including adding lab equipment, gaining regulatory approval, and improving practice management, reporting, billing systems, and software. (*Id.* ¶ 32.)

On or about March 6, 2020, Coastal principals Britton-Harr and G. Ellsworth Harris had an in-person meeting in Charleston, South Carolina with Defendants James Silliman, Bo Silliman, and David Zigerust, who represented Defendant ZDX.  (*Id.* ¶ 33.)  At the meeting, Britton-Harr and Harris reiterated to ZDX that a material incentive for Coastal to acquire the Arizona labs and to engage ZDX thereby was for ZDX to assist Coastal in completing the regulatory compliance procedures so the labs could perform COVID-19 testing.  (*Id.*)  The ZDX representatives assured Coastal that ZDX could and would meet Coastal's needs and timeline.  (*Id.*)  ZDX repeatedly reassured Coastal that it could obtain the EUA consistent with Coastal's detailed timeline.  (*Id.* ¶¶ 35-36.)

## III.     The parties' agreements

On March 15, 2020, Coastal Labs and ZDX entered into a "Management Services Agreement," by which ZDX agreed to provide lab management services and quickly obtain an EUA to enable Coastal to perform COVID-19 testing.  (*Id.* ¶ 38.)  This agreement required the parties to engage in binding arbitration to resolve "disputes or controversies arising out of or relating to the Agreement."  (Management Services Agreement § 8.9, ECF No.  14-6.)  Coastal and ZDX also entered into a "Technology Transfer License Agreement," by which ZDX agreed to provide, *inter alia*, a "custom designed laboratory information management system (LIMS)" for Coastal to manage the large volume of medical tests it expected the Arizona labs to process.  (Am. Compl. ¶ 39.) This agreement required litigation to be brought in Delaware courts.  (Technology Transfer License Agreement § 14, ECF No. 14-5.)  Meanwhile, Plaintiffs allege that Dr. Jolly, James Silliman, Vigerust, and Williamson, recognizing the acute need for COVID-19 testing, formed Defendant Sensiva in March of

2020 to administer COVID-19 tests, and that Sensiva would subsequently perform for Cormeum the same role that AMS performed for Coastal.  (Am. Compl. ¶ 37.)

On March 18, 2020, Coastal purchased the Arizona labs from Dr. Jolly for $3 million pursuant to a "Membership Interest Purchase Agreement."  (*Id.* ¶ 41.)  This agreement contained no venue provision.  (Membership Interest Purchase Agreement, ECF No. 14-11.)  By this time, Coastal and AMS had both relocated their primary offices to Maryland and were conducting their business operations out of their current address in Annapolis, Maryland.  (Am. Compl. ¶ 42.)  In the following weeks, Coastal and AMS entered into dozens of contracts with nursing homes to perform testing, including 30 nursing homes in Maryland.  (*Id.* ¶ 44.)  ZDX also sent personnel to manage the Arizona labs to scale up their testing volume capability and to promptly obtain EUA certifications.  (*Id.* ¶ 45.)

### IV.    Redirection of services to Defendant Cormeum Labs

Plaintiffs allege that ZDX never actually performed the expected services for Coastal, and instead redirected its personnel from the Arizona labs to New Orleans to obtain an EUA for Defendant Cormeum Labs.  (*Id.* ¶¶ 46-47.)  Plaintiffs allege that ZDX charged Coastal for hotel rooms in New Orleans and used employees that Coastal was paying to do work for the Arizona labs instead to obtain the EUA for Defendant Cormeum.  (*Id.* ¶ 47.)  ZDX filed paperwork to obtain an EUA for Cormeum on April 4, 2020.  (*Id.* ¶ 48.)  The FDA received Cormeum's EUA application on April 6, 2020, permitting Cormeum to begin COVID-19 testing 24 hours thereafter.  (*Id.* ¶ 49.) Meanwhile, Coastal had not obtained an EUA and was not able to meet COVID-19 testing needs of its nursing home customers.  (*Id.* ¶ 50.)

On or about April 7, 2020, proposing a "solution" to Coastal's lack of an EUA for the Arizona labs, James Silliman told Coastal to send all of its COVID-19 test samples to Dr. Jolly's lab, Cormeum. (*Id.* ¶ 51.) Coastal accepted this advice, "supposedly on a temporary basis," until ZDX could assist Coastal to obtain EUAs for the Arizona labs. (*Id.* ¶ 52.) The same day, Coastal and Cormeum entered into a "Laboratory Services Agreement" and "Laboratory Services Work Order," which provided the terms under which Cormeum would provide lab services to Coastal for COVID-19 testing, including a cost to Coastal of $87 per test. (*Id.* ¶¶ 53-54.) The Laboratory Services Agreement contained a forum selection clause requiring litigation "with respect to this Agreement or any Order (or the Work performed thereunder) shall be exclusive in the courts, state or federal, sitting in Orleans Parish, Louisiana." (Laboratory Services Agreement § 12.1, ECF No. 14-3.) As a result of this contract, AMS began sending COVID-19 test samples directly to Cormeum for processing. (Am. Compl. ¶ 55.)

## V.     Cormeum and Coastal's relationship

In May of 2020, Dr. Jolly told Britton-Harr that a government contract that Cormeum recently entered required it to charge the government customer the lowest fee for COVID-19 testing that it charged its other customers, and that the government fee was $120 per test. (*Id.* ¶ 57.) As a result, according to Dr. Jolly, Coastal's fee of $87 per test would have to be increased to avoid violating the "most favored nation" pricing. (*Id.* ¶ 58.) Coastal allegedly had no choice but to agree to the 26% price increase to $110 per test because Coastal still had no EUAs for its Arizona labs. (*Id.* ¶¶ 58-59.)

On or about June 18, 2020, Dr. Jolly and Britton-Harr executed a letter agreement entitled "Limited Adjustment Period for Payment of Invoices for Goods & Services; Revised Pricing Terms for Guaranteed Minimums & Limited Exclusivity." This June 18, 2020 letter agreement provided for a reduced price of $70 for COVID-19 testing as long as Coastal met a minimum volume of testing samples (*Id.* ¶¶ 62-67.) The letter agreement also provided for Cormeum's "borrowing" of Coastal's additional lab equipment valued at $500,000, which Coastal shipped overnight to Cormeum's lab in Louisiana. (*Id.*)

## VI.    The parties' relationship deteriorates

On or about July 10, 2020, Dr. Jolly allegedly sent Britton-Harr an email claiming that Coastal was far behind on its payments for testing and that COVID-19 testing was either "at a stop" or "significantly delayed." (*Id* ¶ 69.) Coastal alleges this was not true, and that it had paid Cormeum a total of $1,723,856 which satisfied all of Cormeum's invoices issued through June 28, 2020. (*Id.* ¶ 70.) On or about July 13, 2020, Dr. Jolly sent Britton-Harr another email threatening to stop testing unless payments were made immediately. (*Id.* ¶ 71.) According to Plaintiffs, no invoices were overdue as of July 13, 2020 and the parties' agreement provided that the next payment was not due until at least July 17, 2020. (*Id.*)

On or about July 14, 2020, Cormeum and Sensiva, at the direction of co-Defendants Dr. Jolly and James Silliman, halted shipments of test kits to Plaintiffs' customer nursing homes. (*Id.* ¶ 72.) On or about July 16, 2020, Dr. Jolly's attorney emailed Coastal a proposed "settlement" agreement, which deemed Coastal's alleged "past due" invoices satisfied if: (1) Coastal forfeited to Cormeum the equipment and supplies loaned to Cormeum for COVID-19 testing; (2) Coastal assigned Cormeum all of its claims for Medicare reimbursement for

COVID-19 testing and appointed James Silliman as Coastal's attorney for those claims; and (3) Coastal formally introduced its current and prospective customers to Cormeum. (*Id.* ¶ 73.) Coastal refused to sign the settlement agreement. (*Id.* ¶ 77.)

On or about July 17, 2020, Defendants blocked Plaintiffs from access to the web portal where COVID-19 test results were reported. (*Id.* ¶ 78.) On July 18, 2020, Defendants also cut off all of AMS's nursing home customers' access to the COVID-19 test results web portal, including to Plaintiffs' Maryland-based nursing home customers. (*Id.* ¶¶ 79-81.) As a result, Plaintiffs received numerous complaints from their nursing home customers. (*Id.* ¶ 82.)

Defendant Vita Health, which hosted the web portal where COVID-19 test results were reported, provided a link to a help desk that allegedly falsely claimed Coastal was not paying its bills to Cormeum and that Sensiva would restore service only if the nursing homes would switch from Coastal/AMS to Cormeum for COVID-19 testing. (*Id.* ¶¶ 85-88.) Plaintiffs allege that this caused them to lose potential nursing home customers in Maryland and actual nursing home customers in other states, as nursing homes declined to employ Plaintiffs based on the difficulties created by Defendants Cormeum and Sensiva. (*Id.* ¶¶ 89-90.) Within two weeks, Plaintiffs Coastal Laboratories Inc. and AMSOnSite, Inc. took legal action.

## VII.    Procedural Background

Plaintiffs filed suit in this Court on July 31, 2020 pursuant to diversity jurisdiction under 28 U.S.C. § 1332(a), asserting tortious interference with prospective business relations (Count I), tortious interference with economic relations (Count II), and civil conspiracy (Count III) against all Defendants. (Compl., ECF No. 1.) Plaintiffs also emailed Defendants' counsel,

demanding the return of the loaned lab equipment by August 4, 2020.  (Am. Compl. ¶ 91, ECF No. 13.)  On August 3, 2020, Defendants' counsel stated that the equipment had been "gifted" by Coastal to Cormeum.  (*Id.* ¶ 92.)  Cormeum remains in possession of this lab equipment.  (*Id.* ¶ 95.)  On August 5, 2020, Cormeum filed suit against Coastal, AMS, and Britton-Harr, individually, in the United States District Court for the Eastern District of Louisiana, alleging breach of contract, suit on open account, and defamation.  *See Cormeum Lab Services, LLC v. Coastal Laboratories, Inc. et al.*, Docket No. 2:20-cv-02196-SM-DPC (E.D. La. Aug 5, 2020).

On August 6, 2020, Defendants filed a Motion to Dismiss for Lack of Jurisdiction in this Court.  (ECF No. 8.)  On August 12, 2020, Dr. Tarun Jolly filed a declaratory judgment action in the U.S. District Court for the Eastern District of Louisiana against Coastal Labs, Britton Harr, individually, and Britton-Harr Enterprises, Inc., seeking a judgment that the lab equipment allegedly owned by Coastal Labs was collateral in favor of Dr. Jolly.  (*See Jolly v. Coastal Laboratories, Inc. et al.*, Docket No. 2:20-cv-02230-WBV-JV (E.D. La. Aug. 12, 2020).  The Louisiana cases, *Cormeum v. Coastal* and *Jolly v. Coastal*, were consolidated by Judge Morgan in the Eastern District of Louisiana.

On August 19, 2020, Plaintiffs filed an Amended Complaint in this case, adding a conversion claim against Defendant Cormeum (Count IV), an unfair competition claim against all Defendants (Count V), and a fraud claim against all Defendants (Count VI).  (Am. Compl., ECF No. 13.)  On September 3, 2020, Defendants filed the presently pending Motion to Dismiss Plaintiffs' Amended Complaint Pursuant to Rules 12(b)(3), 12(b)(2), 12(b)(6) and the

11

"First-Filed" Rule.  (ECF No. 14.)  This Court held a hearing on Defendants' Motion on November 18, 2020.  (ECF No. 19.)

## ANALYSIS

Defendants seek to dismiss the Amended Complaint for lack of jurisdiction, improper venue, the "first-to-file" rule, and failure to state a claim.  In the alternative to dismissal, they seek to transfer this action to the United States District Court for the Eastern District of Louisiana based on the forum selection clause in the Laboratory Services Agreement.

## I.      Personal Jurisdiction

A motion to dismiss under Rule 12(b)(2) of the Federal Rules of Civil Procedure for lack of personal jurisdiction challenges a court's authority to exercise its jurisdiction over the moving party. *Combs v. Bakker*, 886 F.2d 673, 676 (4th Cir. 1989). The jurisdictional question is "one for the judge, with the burden on the plaintiff ultimately to prove the existence of a ground for jurisdiction by a preponderance of the evidence." *Id.*; *Sigala v. ABR of VA, Inc.*, 145 F. Supp. 3d 486, 489 (D. Md. 2014). While a court may hold an evidentiary hearing or permit discovery as to the jurisdictional issue, it also may resolve the issue on the basis of the complaint, motion papers, affidavits, and other supporting legal memoranda. *Consulting Eng'rs Corp. v. Geometric Ltd.*, 561 F.3d 273, 276 (4th Cir. 2009); *see also Sigala*, 145 F.Supp.3d at 489.

If a court does not hold an evidentiary hearing or permit discovery, a plaintiff need only make "a *prima facie* showing of a sufficient jurisdictional basis to survive the jurisdictional challenge." *Consulting Eng'rs Corp.*, 561 F.3d at 276. When considering whether the plaintiff has made the requisite showing, "the court must take all disputed facts and reasonable inferences in favor of the plaintiff." *Carefirst of Maryland, Inc. v. Carefirst Pregnancy Ctrs., Inc.*, 334 F.3d 390,

396 (4th Cir. 2003). Notably, "a threshold *prima facie* finding that personal jurisdiction is proper does not finally settle the issue; plaintiff must eventually prove the existence of personal jurisdiction by a preponderance of the evidence, either at trial or at a pretrial evidentiary hearing." *New Wellington Fin. Corp. v. Flagship Resort Dev. Corp.*, 416 F.3d 290, 294 n. 5 (4th Cir. 2005) (emphasis in original) (citation omitted).

Before a court can exercise personal jurisdiction over a non-resident defendant, a court must determine that (1) the exercise of jurisdiction is authorized under the state's long-arm statute pursuant to Rule 4(k)(1)(a) of the Federal Rules of Civil Procedure; and (2) the exercise of jurisdiction conforms to the Fourteenth Amendment's due process requirements. *Carefirst*, 334 F.3d at 396; *Sigala*, 145 F.Supp. at 489. To satisfy the first prong, a plaintiff must identify a provision in the Maryland long-arm statute that authorizes jurisdiction. *Ottenheimer Publishers, Inc. v. Playmore, Inc.*, 158 F. Supp. 2d 649, 652 (D. Md. 2001). When interpreting the reach of Maryland's long-arm statute, Md. Code Ann., Cts. & Jud. Proc., § 6-103(b), this Court must adhere to the interpretations of the Maryland Court of Appeals. *Snyder v. Hampton Indus., Inc.*, 521 F. Supp. 130 (D. Md. 1981), *aff'd*, 758 F.2d 649 (4th Cir. 1985); *Tulkoff Food Prod., Inc. v. Martin*, No. ELH-17-350, 2017 WL 2909250, at *4 (D. Md. July 7, 2017) (citation omitted).

Although Maryland courts "have consistently held that the state's long-arm statute is coextensive with the limits of personal jurisdiction set out by the Due Process Clause of the Constitution," *Carefirst*, 334 F.3d at 396, courts must address both prongs of the personal jurisdiction analysis. *Metro. Reg'l Info. Sys., Inc. v. American Home Realty Network, Inc.*, 888 F.Supp.2d 691, 699 (D. Md. 2012); *CSR, Ltd. V. Taylor*, 411 Md. 457, 475-76 (2009). Under the second prong, courts determine whether the exercise of personal jurisdiction comports

13

with the Fourteenth Amendment's due process requirements. For a non-resident defendant, "due process requires only that . . . a defendant . . . have certain minimum contacts . . . such that the maintenance of the suit does not offend traditional notions of fair play and substantial justice." *Int'l Shoe Co. v. Washington*, 326 U.S. 310, 316 (1945) (quoting *Milliken v. Meyer*, 311 U.S. 457, 463 (1940)). A "minimum contacts" determination rests on the number and relationship of a defendant's contacts to the forum state, as well as whether the present cause of action stems from the defendant's alleged acts or omissions in the forum state. *Id.*

Thus, a court may exercise two types of personal jurisdiction: "'general' (sometimes called 'all-purpose') jurisdiction and 'specific' (sometimes called 'case-linked') jurisdiction." *Bristol-Myers Squibb Co. v. Superior Court of California, San Francisco Cty.*, 137 S. Ct. 1773, 1780 (2017). General jurisdiction arises from a defendant's continuous and systematic contacts in the forum state. *Id.* On the other hand, specific jurisdiction arises when there is an "affiliation between the forum and the underlying controversy." *Id.*; *Carefirst*, 334 F.3d at 397. When assessing specific jurisdiction, the United States Court of Appeals for the Fourth Circuit considers: "(1) the extent to which the defendant purposefully availed itself of the privilege of conducting activities in the State; (2) whether the plaintiffs' claims arise out of those activities directed at the State; and (3) whether the exercise of personal jurisdiction would be constitutionally reasonable." *Consulting Engineers*, 561 F.3d at 278.

## A. Maryland's long-arm statute authorizes the exercise of personal jurisdiction

Section 6-103(b)(1) and (3) of Maryland's long-arm statute authorize the exercise of personal jurisdiction over the Defendants. These provisions state:

 (b) A court may exercise personal jurisdiction over a person, who directly or by an agent:

(1) Transacts any business or performs any character of work or service
in the State; [or]

…

(3) Causes tortious injury in the State by an act or omission in the State.

Md. Code. Ann., Cts. & Jud. Proc. § 6-103.  In *Swarey v. Stephenson*, 222 Md. App. 65, 112 A.3d

534 (2015), the Maryland Court of Special Appeals explained that to "transact business" under

the statute requires that the defendant's actions "culminate[] in purposeful activity within

Maryland."  222 Md. App. at 99-100, 112 A.3d 534; *see also Advanced Datacomm Testing Corp. v.

PDIO, Inc.*, No. DKC-08-3294, 2009 WL 2477559, at *4 (D. Md. Aug. 11, 2009) ("Where the

contacts involve a contract, 'Maryland courts could and would assert jurisdiction over a party

to a contract in a suit for breach of that contract if the party has performed purposeful acts in

Maryland in relation to the contract, albeit preliminary or subsequent to its execution.'"

(quoting *Du–Al Corp. v. Rudolph Beaver, Inc.,* 540 F.2d 1230, 1232 (4th Cir. 1976))).  As to

causing tortious injury in the state, personal jurisdiction may also be asserted over a defendant

based solely on electronic contacts with the forum state.  *See Lewis v. Willough at Naples*, 311 F.

Supp. 3d 731, 737 (D. Md. 2018).

As explained in more detail below, Plaintiffs allege that Defendants negotiated and

executed a variety of agreements, specifically the Management Services Agreement, the

Technology Transfer License Agreement, and the Membership Interest Purchase Agreement,

with Plaintiffs, both Maryland entities, whereby Defendants received substantial, ongoing

payments from Plaintiffs in Maryland for services Defendants provided to Plaintiffs'

customers in Maryland.  (*See* Am. Compl. ¶¶ 42, 44, 46, 54, 70, ECF No. 13.)  In addition,

Plaintiffs allege that Defendants caused tortious injury to Plaintiffs' businesses in Maryland by,

*inter alia*, unjustifiably shutting off web portal access to Plaintiffs' Maryland customers and

15

causing Plaintiffs to lose business opportunities in Maryland.  (*Id.* ¶¶ 79-89.)  Accordingly, the Court is satisfied that Maryland's long-arm statute authorizes the exercise of personal jurisdiction over Defendants.

## B. Exercise of personal jurisdiction over Defendants comports with Due Process

The thrust of Defendants' Motion is that the exercise of personal jurisdiction over them does not comport with Due Process.  The parties do not dispute, however, that if personal jurisdiction extends to Defendants, it arises under specific jurisdiction rather than general jurisdiction.  The Court is satisfied that Plaintiffs have established a *prima facie* case of specific personal jurisdiction based on Defendants' contacts directed at Plaintiffs and their businesses in Maryland.

As this Court summarized in *Johansson Corp. v. Bowness Const. Co.*, 304 F. Supp. 2d 701 (D. Md. 2004), in the context of specific jurisdiction over a defendant when a contract is involved:

> The Supreme Court has made clear that an out-of-state party's contract with a party based in the forum state cannot "automatically establish sufficient minimum contacts" in the forum state. *Burger King Corp. v. Rudzewicz,* 471 U.S. 462, 478, 105 S. Ct. 2174, 85 L.Ed.2d 528 (1985). Instead, the court must perform an individualized and pragmatic inquiry into the surrounding facts such as prior negotiations, the terms of the contract, the parties' actual course of dealing, and contemplated future consequences, in order to determine "whether the defendant purposefully established minimum contacts within the forum." *Id.* at 479, 105 S. Ct. 2174; *see also Mun. Mortgage & Equity v. Southfork Apartments Ltd. P'ship,* 93 F. Supp. 2d 622, 626 (D. Md. 2000). Among the specific facts that courts have weighed are "where the parties contemplated that the work would be performed, where negotiations were conducted, and where payment was made." *Mun. Mortgage & Equity,* 93 F. Supp. 2d at 626 (internal quotation omitted). One of the most important factors is "whether the defendant initiated the business relationship in some way." *See id.* at 626–27 (quoting *Nueva Eng'g, Inc. v. Accurate Elecs., Inc.,* 628 F. Supp. 953, 955 (D. Md. 1986)). Ultimately, the question is whether the contract had a "substantial connection" to the forum state. *Burger King,* 471 U.S. at 479, 105 S. Ct.

16

2174; *Diamond Healthcare of Ohio, Inc. v. Humility of Mary Health Partners,* 229 F.3d 448, 451 (4th Cir. 2000).

304 F. Supp. 2d at 705. "Even a single contact may be sufficient to create jurisdiction when the cause of action arises out of that single contact, provided that the principle of 'fair play and substantial justice' is not thereby offended." *Carefirst*, 334 F.3d at 397 (citation omitted); *see also Under Armour, Inc. v. Battle Fashions, Inc.*, 294 F. Supp. 3d 428, 434 (D. Md. 2018).

Here, the Court's *prima facie* inquiry of the parties' negotiations, contracts, course of dealing, and contemplated future consequences reveals that it is alleged that Defendants purposefully established minimum contacts in Maryland.  It is alleged that Defendants diligently pursued, negotiated, and executed multiple contracts with the Maryland Plaintiffs, whereby Defendants agreed to perform and did perform services for Plaintiffs' Maryland clients.  For example, Plaintiffs allege that Defendants assisted Plaintiffs in processing medical samples, reporting results, and billing for testing services to Plaintiffs' customers in Maryland. (Am. Compl. ¶ 40.)  Specifically, Defendants maintained a web portal through which they provided COVID-19 test results to Plaintiffs' customers in Maryland.  (*Id.* ¶¶ 79, 81.)  When Defendants allegedly shut off the web portal access to Plaintiffs' Maryland customers, they simultaneously encouraged these Maryland customers to "contract[] directly" with Defendants to resolve the problem.  (*Id.* ¶¶ 72-88.)  Defendants also allegedly sought patient information from Plaintiffs' Maryland customers in order to directly bill them for COVID-19 tests conducted by Cormeum on behalf of Plaintiffs.  (*Id.* ¶ 105.)  Defendants cannot plausibly claim that they are surprised that Plaintiffs brought their claims in this Court. *See Vogel v. Morpas*, No. RDB-17-2143, 2017 WL 5187766, at *6 (D. Md. Nov. 9, 2017) ("[defendant] cannot plausibly claim that it is surprised that as a result of brokering that Agreement, litigation in

Maryland might ensue. Accordingly, this Court finds that [the defendant] purposefully availed itself of the privilege of conducting activities in Maryland.").

Plaintiffs have also established that Defendants have the requisite minimum contacts to satisfy Due Process under Section 6-103(b)(3) for "tortious injury in the State." Plaintiffs allege that personal jurisdiction is warranted on this basis under the three-part test regarding electronic activity adopted by the Fourth Circuit in *ALS Scan, Inc. v. Digital Service Consultants, Inc. See* 293 F.3d 707 (4th Cir. 2002). Under that test, personal jurisdiction over a defendant complies with Due Process based on a defendant's electronic activity if the defendant: "(1) directs electronic activity into the State, (2) with the manifested intent of engaging in business or other interactions within the State, and (3) that activity creates, in a person within the State, a potential cause of action cognizable in the State's courts." *Id.* at 714; *see also Lewis v. Willough at Naples*, 311 F. Supp. 3d 731, 737 (D. Md. 2018) (applying *ALS Scan*). Plaintiffs have adequately met these threshold requirements in their allegations that Defendants maintained a web portal for Plaintiffs' Maryland customers which Defendants subsequently shut off, thereby exposing the Maryland customers to regulatory and enforcement action by the Maryland Department of Health[1]. (Am. Compl. ¶¶ 79-89.) Defendants allegedly communicated with Plaintiffs' Maryland customers, falsely informing them that Plaintiffs were not paying their bills and encouraging the customers to "contract[] directly" with Defendants. (*Id.* ¶¶ 81-88.) As a result, Plaintiffs allege that they lost an opportunity to expand their business with existing nursing home customers in Maryland. (*Id.* ¶ 89.) Accordingly, this

---

[1] *See* Md. Dep't of Health, Amended Directive and Order Regarding Nursing Home Matters Pursuant to Executive Orders Nos. 20-06-10-01, 20-04-29-01, and Various Health Care Matters of March 16, 2020, No. MDH 2020-10-27-01 (Oct. 27, 2020) (providing reporting requirements for nursing homes in Maryland).

Court is satisfied that personal jurisdiction over Defendants comports with Due Process because Defendants directed electronic activity within Maryland with the intent of engaging in business within the State, and that such activity caused harm to Maryland residents.

### C. Conspiracy theory of jurisdiction

Finally, Plaintiffs have also adequately alleged the conspiracy theory of jurisdiction. Under this theory, a party "may be subject to suit in the forum jurisdiction based upon a co-conspirator's contacts with the forum state." *Mackey v. Compass Mktg.,* 892 A.2d 479, 484 (Md. 2006). "Simply stated, the conspiracy theory of personal jurisdiction allows a court to exercise jurisdiction over an out-of-state defendant whose co-conspirators have committed jurisdictionally sufficient acts within the forum state." *Capital Source Fin., LLC v. Delco Oil, Inc.*, 625 F. Supp. 2d 304, 315 (D. Md. 2007) (citing *Mackey,* 892 A.2d at 484). The Maryland Court of Appeals provided four elements that must be satisfied for a court to exercise conspiracy jurisdiction over a defendant:

> (1) two or more individuals conspire to do something
> (2) that they could reasonably expect to lead to consequences in a particular forum, if
> (3) one co-conspirator commits overt acts in furtherance of the conspiracy, and
> (4) those acts are of a type which, if committed by a non-resident, would subject the nonresident to personal jurisdiction under the long-arm statute of the forum state....

*Mackey,* 892 A.2d 479 at 486 (quoting *Cavity v. Bloch,* 544 F. Supp. 133, 135 (D. Md. 1982)). Importantly, the Court emphasized that the second element is satisfied "only if the other co-conspirator reasonably expects *at the time the other conspirator agreed to participate in the conspiracy* ... that such acts will subject the co-conspirator who performs them to the personal jurisdiction of the forum state." *Id.* at 489. Although all four elements are required, it is this second element that is crucial to making the conspiracy theory of jurisdiction constitutional. Notably,

it invokes a reasonable person standard and no proof of actual knowledge is necessary. *Id.* at 495-96. However, the hypothetical "reasonable person" must form the pertinent expectation at the time the agreement with the co-conspirator was formed. *Id.* at 489.

Each Defendant is also subject to personal jurisdiction in Maryland under the conspiracy theory of jurisdiction. As discussed below, Plaintiffs have adequately alleged a civil conspiracy whereby Defendants coordinated a strategy to lure Coastal into an agreement to purchase the Arizona labs, and falsely promising that Defendants would perform key tasks to equip and manage the labs. (Am. Compl. ¶¶ 75, 120-122.) Plaintiffs further allege that Defendants agreed to work together in concert to impede Coastal's effort to obtain an EUA, divert medical testing away from Plaintiffs' labs to Defendants' labs, divert nursing home customers from Plaintiffs to Defendant Sensiva, and to steal Plaintiffs' business by denying Maryland nursing home customers access to their COVID-19 test results. (*Id.*) Accordingly, Plaintiffs sufficiently allege that Defendants knew at the time they were taking the actions, that the result of their actions would harm Maryland residents, such that a reasonable person could have foreseen that Maryland could exercise jurisdiction over all the conspirators to those actions.

In sum, Plaintiff has made a *prima facie* showing that exercising personal jurisdiction over their claims does not "offend traditional notions of fair play and substantial justice." *Int'l Shoe*, 326 U.S. at 316. Accordingly, the Defendants' 12(b)(2) Motion to Dismiss for lack of personal jurisdiction is DENIED.

## II.    Venue

Defendants seek either to transfer this action under 28 U.S.C. § 1404(a) or to dismiss this action for improper venue under Federal Rule of Civil Procedure 12(b)(3) based on the mandatory forum selection clause in the Laboratory Services Agreement.

## A. Motion to Transfer

Section 1404(a) of Title 28 of the United States Code provides that "[f]or the convenience of parties and witnesses, in the interest of justice, a district court may transfer any civil action to any other district or division where it might have been brought or to any district or division to which all parties have consented." 28 U.S.C. § 1404(a). Notably, Section 1404(a) "reflects an increased desire to have federal civil suits tried in the federal system at the place called for in the particular case by considerations of convenience and justice." *Van Dusen v. Barrack*, 376 U.S. 612, 616, 84 S.Ct. 805, 11 L.Ed.2d 945 (1964). The movant bears the burden of showing that transfer to another venue is proper. *See Stratagene v. Parsons Behle & Latimer*, 315 F. Supp. 2d 765, 771 (D. Md. 2004). A district court has great discretion in determining whether to transfer a case under § 1404(a), and the decision is made according to an "individualized, case-by-case consideration of convenience and fairness." *Stewart Org., Inc. v. Ricoh Corp.*, 487 U.S. 22, 29, 108 S.Ct. 2239, 101 L.Ed.2d 22 (1988); *Lexecon Inc. v. Milberg Weiss Bershad Hynes & Lerach*, 523 U.S. 26, 34, 118 S.Ct. 956, 140 L.Ed.2d 62 (1998); *Capitol Payment Systems, Inc. v. Di Donato*, No. ELH-16-882, 2017 WL 2242678, at *8 (D. Md. May 23, 2017). However, "unless the balance is strongly in favor of the defendant, the plaintiff's choice of forum should rarely be disturbed." *Collins v. Straight, Inc.*, 748 F.2d 916, 921 (4th Cir. 1984).

When a forum selection clause is implicated, the Supreme Court of the United States has directed that such clauses "are *prima facie* valid and should be enforced unless enforcement

is shown by the resisting party to be 'unreasonable under the circumstances.'" *M/S Bremen v. Zapata Off–Shore Co.*, 407 U.S. 1, 10, 92 S. Ct. 1907, 32 L.Ed.2d 513 (1972).  If a forum selection clause is mandatory, i.e. one that "contain[s] clear language showing that jurisdiction is appropriate only in the designated forum," then the Court must then determine whether enforcement of the clause would be "unreasonable." *Bremen*, 407 U.S. at 10, 92 S. Ct. 1907; *see also Vulcan Chem. Techs., Inc. v. Barker*, 297 F.3d 332, 339 (4th Cir. 2002) ("absent a showing that the chosen forum is unreasonable or was imposed by fraud or unequal bargaining power, the parties' choice should be enforced"); *Koch v. America Online, Inc.*, 139 F. Supp. 2d 690, 693 (D. Md. 2000).  A forum selection clause may be found unreasonable if "(1) [its] formation was induced by fraud or overreaching"; (2) the complaining party "will for all practical purposes be deprived of his day in court" because of the grave inconvenience or unfairness of the selected forum; (3) the fundamental unfairness of the chosen law may deprive the plaintiff of a remedy; or (4) "[its] enforcement would contravene a strong public policy of the forum state." *Allen v. Lloyd's of London*, 94 F.3d 923, 928 (4th Cir. 1996) (citing *Bremen*, 407 U.S. at 18, 92 S. Ct. 1907).

Where, as here, conflicting forum selection clauses are implicated, federal courts "often decline to enforce both clauses out of concern for wasting judicial and party resources." *Jones v. Custom Truck & Equipment, LLC*, 2011 WL 250997, at * 4 (E.D. Va. Jan 25, 2011).  "These courts undertake fact-intensive analyses to determine which forum selection clause should be enforced." *Id.*  As the Fourth Circuit has noted, "the question is not whether to enforce a forum selection clause; it is, instead, *which* forum selection clause to enforce." *Purac Eng'g v. County of Henrico*, 35 F.3d 556 (Table) (4th Cir. Sept. 13, 1994).  To make this determination,

22

"it is the forum selection clause of the *controlling* document that is to be given effect." *Id.* (emphasis added).

Defendants argue that the controlling document in this case is the April 7, 2020 Laboratory Services Agreement, which contains the following forum selection clause: "Venue for any litigation filed with respect to this Agreement or any Order (or the Work performed thereunder) shall be exclusive in the courts, state or federal, sitting in Orleans Parish, Louisiana." (*See* ECF No. 14-3 § 12.1.)   Defendants also recognize that the Technology Transfer Agreement contains a venue provision for suits to be brought in Delaware, and the Management Services Agreement requires the parties to engage in binding arbitration. (See Technology Transfer Agreement § 14, ECF No. 14-5; Management Services Agreement § 8.9, ECF No. 14-6.) For their part, Plaintiffs argue that the controlling document is the March 18, 2020 Membership Interest Purchase Agreement, which does not contain a venue provision. (*See* ECF No. 14-11.)

The Laboratory Services Agreement executed only by parties Coastal and Cormeum, and which was not the first-executed contract implicated in this case, is not the controlling document. Plaintiffs' tort-based claims are instead related to a variety of contracts executed between the parties. The thrust of Plaintiff's case is that Defendants fraudulently induced Plaintiffs into buying two Arizona labs by assuring Plaintiffs that they would gain regulatory approval for COVID-19 testing, persuading Plaintiffs to lend their valuable lab equipment to Defendants, all while Defendants formed their own entities to allegedly compete with and diminish Plaintiffs' role and allegedly usurp their lab equipment. These allegations do not arise solely out of the Laboratory Services Agreement, but instead are part of a much larger tort-

based allegation that Defendants committed fraud against Plaintiffs starting in early 2020, before the Laboratory Services Agreement was executed. Accordingly, the Court cannot find that the Laboratory Services Agreement is the controlling document in this case. *See Kelly v. Ammado Internet Services, Ltd.*, 2012 WL 4829341, at *4 n.3 (E.D. Va. Oct. 10, 2012) (finding forum selection clause inapplicable where another written agreement without a forum selection clause governed Plaintiff's claims and "the plain language of the written agreement, considered with all facts construed in the light most favorable to the [Plaintiff], counsels against application of the forum selection clause").

However, as the Court explained on the record at the Motions hearing, this does not necessarily mean that the Court finds any of the other three contracts to be controlling. Instead, for the purposes of Defendants' Motion, the Court is satisfied in its determination that, because the Laboratory Services Agreement is not the controlling document, then its forum selection clause does not serve to mandate transfer of this case to Louisiana.

## B. 12(b)(3) Motion to Dismiss

Pursuant to Rule 12 (b)(3) of the Federal Rules of Civil Procedure, a court may dismiss a case for improper venue. Fed. R. Civ. P. 12(b)(3). "In this circuit, when venue is challenged by a motion to dismiss, the plaintiff bears the burden of establishing that venue is proper." *Jones v. Koons Automotive, Inc.*, 752 F. Supp. 2d 670, 679-80 (D. Md. 2010) (citing *Gov't of Egypt Procurement Office v. M/V ROBERT E. LEE*, 216 F. Supp. 2d 468, 471 (D. Md. 2002)). Like a motion to dismiss for lack of personal jurisdiction, "in deciding a motion to dismiss [for improper venue], all inferences must be drawn in favor of the plaintiff, and 'the facts must be viewed as the plaintiff most strongly can plead them.'" *Three M Enters., Inc. v. Tex. D.A.R.*

*Enters., Inc.*, 368 F. Supp. 2d 450, 454 (D. Md. 2005) (quoting *Sun Dun, Inc. of Washington v. Coca-Cola Co.*, 740 F. Supp. 381, 385 (D. Md. 2005)).   In reviewing a motion to dismiss under Rule 12(b)(3), the Court may consider evidence outside the pleadings. *Sucampo Pharms., Inc. v. Astellas Pharma, Inc.,* 471 F.3d 544, 550 (4th Cir. 2006).

To determine whether venue is proper, the Court must turn to 28 U.S.C. § 1391(b). *Atl. Marine Const. Co., Inc. v. U.S. Dist. Court for Western Dist. of Texas*, 571 U.S. 49, 55, 134 S.Ct. 568, 187 L.Ed.2d 487 (2013).  Pursuant to § 1391(b), a civil action may be brought in:

> (1) a judicial district in which any defendant resides, if all defendants are residents of the State in which the district is located;
> (2) a judicial district in which a substantial part of the events or omissions giving rise to the claim occurred, or a substantial part of property that is the subject of the action is situated; or
> (3) if there is no district in which an action may otherwise be brought as provided in this section, any judicial district in which any defendant is subject to the court's personal jurisdiction with respect to such action.

This Court has previously noted that a "substantial part of the events," as used in 1391(b)(2), does not mean "a majority of the events." *Seidel v. Kirby*, 296 F. Supp. 3d 745, 751-52 (D. Md. 2017).  Rather, "[w]hen considering transactional venue for torts cases, courts will generally consider both where the activities arose *and* where the harm was felt." *Id.*

Defendants assert that venue in Maryland is improper because none of the alleged tortious actions took place in Maryland, and the property in question, the lab equipment, is located in Louisiana.  Contrary to Defendants' assertion, venue is proper in Maryland under § 1391(b)(2) because Plaintiffs plainly allege that Defendants' tortious actions were aimed at Plaintiffs' customers in Maryland by, *inter alia*, halting shipment of test kits to customer nursing homes (Am. Compl. ¶ 72), blocking web portal access to nursing home customers in Maryland (*id.* ¶ 81), and using the portal's "help desk" to solicit Plaintiffs' Maryland-based customers (*id.*

¶¶ 85-86).  Plaintiffs also allege that they lost potential nursing home customers in Maryland because of Defendants' tortious conduct and that they felt this harm in Maryland because that is where Plaintiffs operate their business.  (*Id.* ¶¶ 7, 8, 42, 89.)  Venue is also proper over the lab equipment located in Louisiana because demand for its return was made in Maryland, and "[w]here venue is proper with respect to one claim, pendent venue permits a court to exercise venue over other claims in which venue is improper."  *See Jones v. Custom Truck & Equip., LLC*, No. 3:10-CV-611, 2011 WL 250997, at *5 (E.D. Va. Jan. 25. 2011).

Finally, this Court reiterates its concern noted on the record at the Motions hearing regarding the suitability of Maryland as a venue versus Louisiana as a venue, where the related action is pending.  (See Motions Hearing Tr. at 49-50, ECF No. 20.)   This case involves a total of nine Defendants, whereas the Louisiana action contains only two of those Defendants, Cormeum and Dr. Jolly.  As the Court explained, the case in Louisiana cannot address all of the allegations contained in this case because seven of the nine Defendants here are not even involved in the Louisiana litigation.  Accordingly, this Court sees no basis for transfer or dismissal and DENIES Defendants' 12(b)(3) Motion to Dismiss.

## III.    "First-to-File" Rule

Defendants argue that Plaintiffs' conversion claim for the lab equipment must be transferred to the United States District Court for the Eastern District of Louisiana based on the "first-to-file rule" because Dr. Jolly initiated a declaratory judgment proceeding regarding the lab equipment *before* Plaintiffs amended their complaint in this case to include a conversion claim regarding the lab equipment.  "[T]he first-to-file rule 'gives priority, for purposes of choosing among possible venues when parallel litigation has been instituted in separate courts,

to the party who first establishes jurisdiction.'" *Neuralstem, Inc. v. StemCells, Inc.*, 573 F.Supp.2d 888, 900 (D. Md. 2008) (quoting *Ellicott Mach. Corp. v. Modern Welding Co., Inc.*, 502 F.2d 178, 180 n. 2 (4th Cir. 1974)).   However, this Court has explained that this rule "yields to the interests of justice, and will not be applied when a court finds compelling circumstances supporting its abrogation," *LWRC Intern., LLC v. Mindlab Media, LLC*, 838 F.Supp.2d 330 (D. Md. 2011) (citation omitted), including "'bad faith, anticipatory suit, and forum shopping.'" *Neuralstem, Inc. v. StemCells, Inc.*, 573 F.Supp.2d 888, 901 (D. Md. 2008) (quoting *Alltrade, Inc. v. Uniweld Products, Inc.*, 946 F.2d 622, 622 (9th Cir. 1991)).

The United States Court of Appeals for the Fourth Circuit follows the "first to file rule" of the United States Court of Appeals for the Second Circuit, pursuant to which the original complaint is the first filed and amendments as of right are "immaterial."  *See Learning Network, Inc. v. Discovery Communications, Inc.*, 11 F. App'x 297, 300 (4th Cir. 2001); *Mattel, Inc. v. Louis Marx & Co.*, 335 F.2d 421, 424 (2d Cir. 1965).  Here, there is no question that the "first-to-file" rule applies such that Plaintiffs were the first to file in this Court on July 31, 2020 before any of the Defendants filed suit in Louisiana in August, 2020.  Despite Plaintiffs' later amendment on August 19, 2020 to add the conversion claim after Dr. Jolly filed suit in Louisiana on August 12, 2020, such amendment clearly related back to Plaintiffs' original Complaint that contained allegations regarding the lab equipment.  (*See* Compl. ¶ 57 , ECF No. 1 ("Cormeum required that Coastal overnight ship its equipment, valued at approximately $500,000, to Cormeum at its laboratory in Louisiana.  Coastal complied.  Cormeum remains in possession of Coastal's equipment as of this filing.").)  Accordingly, the timing of Plaintiffs'

amendment to add the conversion claim is "immaterial" and this claim will not be transferred to the Eastern District of Louisiana.

## IV.    Rule 12(b)(6) Motion to Dismiss

Defendants argue that, even if this Court has jurisdiction and is the proper venue for Plaintiffs' claims, Plaintiffs have nonetheless failed to state claims for relief for tortious interference with prospective business relations (Count I), tortious interference with economic relations (Count II), civil conspiracy (Count III), and fraud (Count VI).

### A.  Standard of Review

Rule 8(a)(2) of the Federal Rules of Civil Procedure provides that a complaint must contain a "short and plain statement of the claim showing that the pleader is entitled to relief." Rule 12(b)(6) of the Federal Rules of Civil Procedure authorizes the dismissal of a complaint if it fails to state a claim upon which relief can be granted.  The purpose of Rule 12(b)(6) is "to test the sufficiency of a complaint and not to resolve contests surrounding the facts, the merits of a claim, or the applicability of defenses." *Presley v. City of Charlottesville*, 464 F.3d 480, 483 (4th Cir. 2006).

The United States Supreme Court's opinions in *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007), and *Ashcroft v. Iqbal*, 556 U.S. 662 (2009), "require that complaints in civil actions be alleged with greater specificity than previously was required." *Walters v. McMahen*, 684 F.3d 435, 439 (4th Cir. 2012) (citation omitted).  In *Twombly*, the Supreme Court articulated "[t]wo working principles" that courts must employ when ruling on Rule 12(b)(6) motions to dismiss. *Iqbal*, 556 U.S. at 678.  First, while a court must accept as true all factual allegations contained in the complaint, legal conclusions drawn from those facts are not afforded such deference.

*Id.* (stating that "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice."); *see also Wag More Dogs, LLC v. Cozart*, 680 F.3d 359, 365 (4th Cir. 2012) ("Although we are constrained to take the facts in the light most favorable to the plaintiff, we need not accept legal conclusions couched as facts or unwarranted inferences, unreasonable conclusions, or arguments." (internal quotation marks omitted)). Second, a complaint must be dismissed if it does not allege "a plausible claim for relief." *Iqbal*, 556 U.S. at 679.

## B. Discussion

The Amended Complaint sufficiently states claims for tortious interference with prospective business relations, tortious interference with contract,[2] civil conspiracy, and fraud. To state a claim for tortious interference with prospective business relations, a plaintiff must allege (1) intentional and willful acts; (2) calculated to cause damage to plaintiff; (3) done to cause damage and loss, without right or justifiable cause by defendant (which constitutes malice); and (4) damage. *Press v. United States*, No. JKB-17-1667, 2018 WL 1211537 (D. Md. Mar. 8, 2018). Plaintiffs adequately allege this tort with their allegations that Defendants willfully refused to send test kits to Plaintiffs' Maryland nursing home customers and blocked Plaintiffs and their customers from accessing their rest results (Am Compl. ¶ 108), that Defendants told Plaintiffs' customers to "contract[] directly" with Defendant Sensiva instead of Plaintiffs (*id.*), that a specific Maryland customer, CommuniCare Health Services, refused to enter a business relationship with Plaintiffs because of the concerns raised by Defendants

---

[2] Plaintiff labelled this claim as "tortious interference with economic relations," but it is recognized in Maryland as "tortious interference with contract."

that were allegedly false (*id.* ¶¶ 90, 109), that Defendants falsely claimed Plaintiffs were not paying their bills (*id.* ¶ 85), and that Defendants did so to drive Plaintiffs out of business (*id.* ¶¶ 85, 89-90).

The elements of tortious interference with contract are: (1) Existence of a contract between plaintiff and a third party; (2) defendant's knowledge of that contract; (3) defendant's intentional interference with that contract; (4) breach of the contract by the third party; and (5) resulting damages to the plaintiff. *Sensormatic Sec. Corp. v. Sensormatic Elecs. Corp.*, 249 F. Supp. 2d 703, 710 (D. Md. 2003).  Plaintiffs adequately allege this tort with their allegations that Plaintiffs had contracts with third-party nursing homes to collect and test COVID samples, that Defendants knew of these contracts based on their dealings with Plaintiffs to assist this testing (Am. Compl. ¶¶ 113-114), that Defendants blocked access to the COVID tests in hopes that nursing homes would break their contracts with Plaintiffs and directly engage with Defendants instead (*id.* ¶ 115), and that the nursing home customers were unable to perform (i.e. were in breach of) their contracts with Plaintiffs because of Defendants' interference with the COVID-19 test result reporting (*id.* ¶¶ 116-117).

To state a claim for civil conspiracy, a plaintiff must allege "a combination of two or more persons by an agreement or understanding to accomplish an unlawful act or to use unlawful means to accomplish an act not in itself illegal, but that the act or means employed resulted in damages to plaintiff." *Hill v. Brush Engineered Materials, Inc.*, 383 F. Supp. 2d 814, 821 (D. Md. 2005).  The conspiracy is dependent on an underlying tort that caused injury to plaintiff. *Id.* (citing *Estate of White ex rel. White v. R.J. Reynolds Tobacco Co.,* 109 F. Supp. 2d 424, 428 (D. Md. 2000)).  Plaintiffs have pled the elements of a civil conspiracy, basing their claim

on the underlying claims for tortious interference which are also adequately pled.  Based on the underlying alleged torts, Plaintiffs allege that Defendants acted in concert to tortiously interfere with Plaintiffs' business by impeding Coastal's efforts to obtain an EUA permit, diverting medical testing from Plaintiffs' labs to Defendant Cormeum labs, falsely declaring that Plaintiffs were not paying their bills, diverting Plaintiffs' nursing home customers to Defendant Sensiva, and stealing Plaintiffs' business by denying their customers access to COVID-19 test results.  (*See* Am. Compl. ¶ 121.)

Finally, to plead fraud, a plaintiff must allege (1) that defendant made a false representation to plaintiff; (2) that the falsity was either known to the defendant or was made with reckless indifference as to its truth; (3) that the misrepresentation was made for the purpose of defrauding plaintiff; (4) plaintiff relied on the misrepresentation and had the right to rely on it; and (5) plaintiff suffered compensable injury resulting from the misrepresentation. *SpinCycle, Inc. v. Kalender*, 186 F. Supp. 2d 585, 590 (D. Md. 2002).  Pursuant to Rule 9 of the Federal Rules of Civil Procedure, a higher standard applies to pleading a fraud claim. "In alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake." "[T]he 'circumstances' required to be pled with particularity under Rule 9(b) are 'the time, place, and contents of the false representations, as well as the identity of the person making the misrepresentation and what he obtained thereby." *Harrison v. Westinghouse Savannah River Co.,* 176 F.3d 776, 784 (4th Cir.1999).

Plaintiffs have pled with particularity that Defendants falsely represented to Plaintiffs that ZDX would promptly obtain an EUA to allow Coastal to perform COVID-19 testing at the Arizona labs.  (Am. Compl. ¶¶ 145-146.)  These alleged misrepresentations occurred both

at in-person meetings in Charleston, South Carolina on or about March 6, 2020 (*id.* ¶ 33); and in February 2020 telephone calls between the parties (*id.* ¶¶ 32, 36.)

In sum, the Court is satisfied that Plaintiffs have adequately alleged claims that meet the plausibility standard as set forth in *Twombly* and *Iqbal*, and Defendants' 12(b)(6) Motion to Dismiss for Failure to State a Claim is DENIED.

## CONCLUSION

For the reasons stated on the record at the motions hearing, and for the reasons stated above, Defendants' Motion to Dismiss Plaintiffs' Amended Complaint Pursuant to Rules 12(b)(3), 12(b)(2), 12(b)(6), and the "First-Filed" Rule (ECF No. 14) is DENIED.

A separate Order follows.


Dated: November 23, 2020


_____/s/_____
Richard D. Bennett
United States District Judge